Mr. Byron, if you're ready, you may proceed. Thank you, Your Honor. May it please the Court, Thomas Byron from the Department of Justice here on behalf of the government defendants who are appellants in this court. I'd like to reserve five minutes for rebuttal, please. The injunction in this case prevents the United States from addressing a serious national security threat posed by foreign adversaries, espionage, and surveillance efforts. At most, the injunction here implicate a time, place, and manner restriction that would be subject to intermediate scrutiny under the Constitution, and the restrictions plainly satisfy that level of scrutiny. Your Honor, one of the main points that kind of stuck out to me was that the government seemed to be arguing, well, we're not really getting rid of WeChat. We're not shutting them down. We're just, you know, putting a few restrictions on them. And yet, they basically are, the government's own affidavits support this idea that within one to two years, the restrictions would shut it down. Does it become less problematic under the First Amendment because it gets shut down two years later than immediately? How do we evaluate that? Sure, Judge Nelson. So, you're absolutely right that the ultimate goal is to shut down the availability of WeChat, the WeChat mobile app, in the United States. But that the goal is to have that take place over a transition period of approximately one to two years. So, I think it... Why does that say that? I mean, and basically you just acknowledged, which I think I appreciate you doing, because it seems like that is the case, that they're just trying to shut down WeChat. They're not, there's a problem in shutting down WeChat. Why doesn't that doom the First Amendment claim? Most significantly, because the least restrictive means test has no place in the intermediate scrutiny analysis, which requires only narrow tailoring. And that that narrow tailoring is entitled to a good deal, entitles the government, that is, to a good deal of leeway in assessing how best to address the particular concern. We see that, for example, in the many sign cases that the Supreme Court in this court have decided. And so, for example, this court has held in cases like Lone Star and GK, the Supreme Court has held in cases like Taxpayers for Vincent, that there's a lot of leeway in the way a government can address even the kinds of interests, like aesthetic interests, that are advanced by prohibiting certain kinds of signs on public property. Well, yeah, but they still have to have another avenue. Even under the intermediate scrutiny, you still have to have another avenue to be able to put this forward. And when the government concedes that the sole purpose was to shut down WeChat totally, I'm confused as to how, what other alternative is being made available to them. Absolutely, Judge Nelson, and so let me address the ample alternative channels requirement of the intermediate scrutiny analysis, which is that third prong. And under that standard, Your Honor, the question isn't whether an alternative channel is identically preferred or meets all of the same features or has all the same features. And I'll just point the court, for example, to the GK case, the City of Oswego, Lake Oswego case, in which this court's analysis of ample alternative channels for certain kinds of signs that were prohibited in that case. It was a total ban on that kind of sign. And the court said that there were ample alternative channels for the plaintiffs there and other sign users to express their views using, for example, radio, handbills, television. In other words, very different mediums of expression. And so too here, as we cited in page 44 of our brief, in referring, I think it's to excerpts of record page 400, note two, there are ample alternative channels for these plaintiffs to express and communicate their views, including other platforms like LINE. So let me ask you about that, though, because the uniqueness of this case is that it's dealing with China. And China is notoriously restrictive on, and one reason why WeChat has become so popular is because there's not a lot of competition within China on other alternatives. So what are there other alternatives that have the same capacity to, you know, reach China or accepted in China that an American user would be able to communicate with you know, with the Chinese audience in Chinese language? Are there other alternatives? Yes, Judge Nelson. And that's why I in the list that I just mentioned, and that we cited, and into the record in this case on I think it's excerpts 402. And those are cited and recounted on page 44 of our opening brief, that there are ample alternative platforms of different internet platforms, including LINE, Signal, Skype, Zoom, etc, that are not blocked in China, in addition to those that are blocked. And there's also by the way, though, and this is why I cited to the analysis in GK, limited the options of telephone, text, email, etc, all of which are ways that these plaintiffs can express themselves and reach users in China. There's no dispute about that question. Now, what this boils down to though, Judge Nelson is the preference of these plaintiffs for the particular features in this app. And let me explain why that's not an appropriate approach to the alternative channels analysis under intermediate scrutiny. Imagine, if you will, that the Russian government or the Iranian government created an app that was the sole means of reaching residents of that country, and that that included malware that allowed the foreign adversary government to compromise sensitive IT systems in the United States. Plaintiff's argument is that because that kind of app permits and facilitates communication or expression of views, the First Amendment prohibits the US government from protecting national security by preventing that app from being downloaded and used in the United States. The Constitution does not permit a foreign adversary government to weaponize the First Amendment. That's not how this works, Judge Nelson. So let me ask you about this. That is one of the complicating factors here. And I don't disagree that there do seem to be some pretty significant national security interests here. Does the fact that it's a foreign government make a difference? Meaning, if there were a US citizen that were setting up a platform to spread disinformation and, you know, foment rebellion against the government, would would the government be able to issue this same executive order to shut down that file, if that ended up being one of the primary purposes? Judge Nelson, I think the answer is no, but not because of the Constitution, but because of the statute. AIPA is targeted at transactions involving foreign interests in property. Well, but the district court didn't base it on AIPA. The district court based the injunction on the First Amendment. Understood. And absolutely. But the answer to your question is that the government could not have issued this kind of executive order or Secretary of Justice because it wouldn't be within the statutory authority of AIPA. But excuse me for interrupting, but could you going back to First Amendment principles, could you explain to me how this is a time, place and manner restriction? I'm not quite getting my head around that. Sure, Judge Schroeder, and I'll note at the outset that we actually think that under cases like cloud books, that this that the First Amendment is just not implicated at all because this is not a regulation of speech in any way. But at most, Your Honor, it's a time, place and manner restriction for the following reason, because like, for example, the sign restrictions addressed in Taxpayers for Vincent or Lone Star or GK Limited, it targets a particular medium or form in which communication can take place. And it says that that medium is not permitted. That that's that is classically a time, place and manner restriction in the sense that it doesn't prohibit speakers, plaintiffs from speaking. It merely tells them that they must use different means, different mediums to communicate their views. It's content neutral in that respect. It applies to all users of WeChat. It applies to WeChat as a whole and only WeChat and thus affects all users equally. It does, as I explained to in response to Judge Nelson's questions, leave leave open ample alternative channels for the expression of those very same views by these plaintiffs. Well, is it does it in effect, is it is it saying you can't use a particular language? No, Judge Schroeder. In fact, isn't that the practical effect? Because all of your alternatives are are different in that respect. No, Judge Schroeder, they're not. So let me address that, that because there's there's some misunderstanding, I think, of plaintiffs argument in the record. So plaintiffs say and this is most evident in their declarations in the supplemental excerpts of record by I believe it's Cohen and I'm sorry, I don't analysis of the alternative platforms that are available. And I'll note that they don't address options such as email, phone and text, which we've emphasized and we think are ample alternatives within the framework of GK Limited, as explained in the dialogue with Judge Nelson. But even those alternatives that they address, such as, for example, Zoom and plaintiffs can engage in Chinese language communication or expression on those platforms. There are other platforms that may not themselves offer, as the declarants say, platform based immediate translation from English to Chinese or vice versa. But that's not a restriction on the use of the Chinese language, Judge Schroeder. So, for example, line and signal permit text based messaging in in other languages, as I understand it. And there's no evidence in this record that contradicts or that demonstrates that they don't permit any use of the Chinese language. A careful analysis of the declarations, I believe, confirms that what the plaintiffs are concerned about is the convenience of using this particular platform, WeChat, because of the features it offers. But again, I will I'll reiterate the example I offered of a Russian or Iranian government communications or expression platform that permits malware. The First Amendment does not preclude the government from using its national security authorities against that kind of platform or medium. That's that's what this case is all about, Judge Schroeder. Well, the features, what are the features that that you think are the important ones here that differentiate this from other platforms? Well, again, just looking at the way this court in GK Limited analyzed ample alternative channels and that requirement of intermediate scrutiny, we don't think features are relevant really at all. If you think about what this court was saying by comparing radio, television, hand signs, the features of signs are unique compared to those alternatives. But the features are not what the First Amendment protects. What the First Amendment protects is the ability of a speaker to express themselves to an audience. Yeah, but they're communicating on this platform because of the features that are there. If you shut them down, then they're no longer able to communicate in the manner that they were before. Isn't that right? So that is right, Judge Schroeder. But again, the First Amendment doesn't protect a foreign business merely because it offers a unique or particularly attractive or preferred method for speakers to communicate. That's what plaintiff's argument boils down to. And there is no support in the case laws, particularly under intermediate scrutiny analysis to support that. Can I ask about the prior restraint point here, because the Supreme Court case, Neer versus Minnesota, in that case, I think was decided in the 1930s, the Supreme Court held it was an impermissible prior restraint to basically shut down a publication just because they were publishing defamatory content. Why isn't that analogous here? It seems to be that's exactly what the government is doing. Is it just because there's a statute that allows the government to do that here? No, Judge Nelson, and I'm glad you brought that up because this is nothing like the prior restraint cases, any of them. And so I'll start with Neer and then turn to some of the other examples that I just rely on. In Neer, what the Supreme Court emphasized is that prior restraint, which is to say future prohibition on publication, on expression of a speaker's own views. And this is critical that the speaker in that case was the newspaper. The newspaper was expressing its own views. The speakers in this case are the plaintiffs, not WeChat itself. WeChat emphasizes throughout its terms of use in reliance on Section 230 and elsewhere that it is not responsible for the content of users' activity on that platform. These plaintiffs are not in any way being restrained from saying anything they wish using another platform. And that's what differentiates this from Neer and from other categorical prior restraints on publication by a speaker, Judge Nelson. So let me turn to the other examples about prior restraint that these plaintiffs have invoked. Most of those fall in the category of licensing with unbridled discretion. And the Supreme Court in Freedman and subsequent cases emphasize that where there is a permitting or licensing requirement that leaves discretion in the hands of a government official and that discretion effectively permits what would amount to content-based discrimination or viewpoint-based discrimination. The First Amendment is particularly concerned about that kind of exercise of There's no such licensing or permitting process here. There is a clear and categorical restriction on a medium, just as in the sign cases, GK, Lone Star, Taxpayers for Vincent, that has nothing to do with prior restraint, Judge Nelson. I'd like to reserve some time for rebuttal. Counsel, before you sit down, I'd like you to turn to Aipa. I have a series of questions. Sure, Judge Pivey. OK, so let's let's start with the opening paragraph of the executive order in which the president cites his authority for doing so. And he cites four things. The Constitution, Aipa, the NEA and 3 U.S.C. Section 301. I will get to Aipa in just a minute. But my first question is, is the government is the government suggesting that the president has independent constitutional authority to enact this executive order? Judge Pivey, we have not made that argument in this case, and we don't think it's necessary for the court to address. OK, and I I have read the NEA and 3 U.S.C. or 3 U.S.C. 301. I didn't see anything of their substance. So I assume that the government is not relying on those as independent bases for the president's order. They're largely procedural statutes. So, Judge Pivey, you're certainly right that they are procedural statutes in the sense that they explicitly clarify the president's authority to address a national emergency. But it doesn't. But but the but the NEA could apply, for example, to a declaration of a national disaster under the Stafford Act. It's just a procedure. It's just the procedural statute tells you what the president has to do in terms of declaring it and publishing and terminating and so on. But it doesn't. There's no substance in there. I think that's mostly right. OK. All right. Then that leaves us with Aipa. Now, under the doctrine of constitutional avoidance, why shouldn't the court begin with Aipa rather than the First Amendment? Because it seems to me that if if Congress has either placed something off limits for the president or effectively reserved to itself the right to regulate in the future, more specifically in matters touching on on the First Amendment, then the president doesn't have authority here to issue this to issue this order. Judge, by the the question you raise of constitutional avoidance might be relevant to the district court as it proceeds, for example, to summary judgment. But this court's review at this stage of the case is of the district court's exercise of its equitable discretion to enter a preliminary injunction constraining the federal government on a particular legal theory based on plaintiff's articulation of particular harms they claim to have suffered. Those are all based, as the district court explained, solely on the constitutional arguments. And the district court here expressly concluded that it did not find a likelihood of success on any of plaintiff's other theories, including the statute. Yeah, but the but the exception is in in 1702. I, I, I assume that the government is not going to is not going to tell us that that that is somehow entirely separate from questions under the First Amendment. But just by the it is true in the legislative history confirms this, that the Congress was motivated by concerns related to the First Amendment. But it is not true that the that one of the exceptions, which is in section 1702 B3 about importation and exportation of information or informational materials. It's not the case that that that exception to IEPA tracks exactly the First Amendment and its protections. And so we see, for example, in the D.C. Circuit and in the Third Circuit, cases where preliminary injunctions were entered concerning the TikTok mobile app precisely on a determination about a likelihood of success on that kind of argument. If I may just conclude the answer to your question, Judge Bybee, the case that this case and this appeal concerns an exercise of discretion on a different legal theory. And it would not be appropriate for this court to uphold on an alternative legal argument that exercise of discretion by the district court. In other words, the entry of a preliminary injunction is very different from the grant of summary judgment in that respect. OK, now a one a couple of last questions, if we if if I disagreed with you on the on the appropriateness of reaching IEPA and agreed with the district court in D.C. on the application of 1702 B1, for example, would we have to do any of the balancing analysis that would be required under a time, place and manner restriction? Well, Judge Bybee, we think so, and I think plaintiffs think so. And the reason is because plaintiffs here have argued that even if IEPA, the statute authorizes this restriction, they say the First Amendment prohibits it. And for that reason, even if this court were to conclude that it should address the statute first, plaintiffs contend that it should also address the constitutional right. But there would be no reason to do that. That's the constitutional avoidance question. If I if I thought if I agreed with with Judge Nichols, then I don't. And and reached the 1702 B1 question and thought that it was applicable. I don't I don't have to do any balancing under the First Amendment, do I? I think that's right, Judge Bybee, as to the statutory question itself. But let me emphasize again that in in the D.C. Circuit Preliminary Injunction Appeal that the government recently that the government recently briefed and argued, that court has has before it full full substantive briefing, addressing those statutory questions, which are complex, Your Honor. They are not sufficiently addressed by this very short supplemental briefs ordered by this court, Souspanti. It would not be appropriate for this court to address in the first instance in this case without full briefing and an opportunity for the parties to be heard and the district court to exercise its equitable discretion. Those are the things that did the district. It's my recollection the district court said it didn't have an adequate record to rule on the statute. It's something like that. Is that correct? I don't. That's not my memory, Your Honor. If I may turn briefly to the court's decision, I think I can point to this. Sorry, if you give me just a minute to do so. The district court said this opinion begins at excerpts of record 67 and turning to the analysis section of that opinion on page. Sorry, Your Honor, this is on page. Eighty four and eighty five of the excerpts that the record and the arguments do not allow the court to conclude that plaintiffs are likely to succeed on the merits of their claim. So I don't think it was just that there was an inadequate record, but that the court analyzed the record before it and the arguments the parties had made and concluded that the plaintiffs had not demonstrated a likelihood of success, which is, of course, the most important factor for a preliminary injunction. Here's my last maybe my maybe my last question, which is I don't understand the government's argument about waiver on IEPA. So, Your Honor, in the plaintiff's responsive brief, they say that this court, they say in a footnote that this court should not itself decide, but should remand for the district court to consider in the first instance the statutory questions. It's only after this court ordered supplemental briefing that they took a different position. And in that sense, because the the parties have presented their arguments in their principal briefs, that should frame the disposition of this. Yeah, but I don't. But I understood the government to have argued that they waived it. Isn't that what you said in your supplemental brief? Your Honor, we said in our supplemental brief that the plaintiff's reference in that footnote to remand. I apologize if you'll give me just a moment that they deliberately waived any statutory challenge as an alternative basis for affirmance. I think that is correct. If you look carefully at page 25 footnote two of the plaintiff's responsive brief. Not that they waive the argument or the claim as a whole, Judge Bybee, but that they waived it as an alternative basis for affirmance. So what they said is, were this court to disagree with the district court's analysis of plaintiff's First Amendment claims? The court should remand without vacating the injunction. So the district court could address whether to grant an injunction on the grounds. That's what they said. Yes. Yes, Judge Schroeder. And that's exactly what we're referring to. We think that that is that is in no way a preservation of an argument that the court, that this court on appeal should affirm on alternative grounds, alternative legal theories, the entry of a preliminary injunction on constitutional grounds. And by the way, Judge Schroeder, just to address the vacature without remand argument, we don't think that would be appropriate because if the district court exercises discretion incorrectly, as we say it did, it should be vacated. That is the fundamental principle of an appeal from a preliminary injunction. I'd be happy to address the questions about how the statute operates, Judge Biby, but I want to be clear that without ample and full briefing of these questions and a 12 to 13 page brief from the court is not sufficient. If you look carefully at the at the full briefing before the D.C. Circuit, for example, there are complex and multiple questions presented about this. And we urge the court to be cautious before striking out on a road that the parties have not fully addressed. Thank you. If I may. Yes. Yeah. Mr. Biby, we'll give you some time for rebuttal. Thank you. Thank you over there. Mr. Gossett. Thank you, Your Honor. I may please the court. The government's ban of WeChat is unprecedented and plainly unlawful. The government sought to block a medium of communication relied on by Chinese Americans to relatives in China. They lack the statutory authority authority to do so under IEPA, and they are precluded from doing so under the First Amendment. Preliminarily, enjoining the ban was plainly correct. In response to the discussion with my friend, Mr. Byron, I have three main points I want to make. First, the WeChat ban plainly violates the terms of IEPA. The government seeks to regulate or prohibit indirectly, if not directly, personal communications and international exchange of information. Second, the assertion that the First Amendment... Can I ask on that first point? The reason is because on one hand, it is just a business to business regulation. But the government has been pretty open, and it's pretty clear that the intent here isn't just business to business, but to regulate speech or regulate. Yeah, information or data. So is that what makes this outside of IEPA? Is the government's intent? Yes, essentially, Your Honor, the government... But what if they said, what if they said, we believe WeChat is a fraudulent corporation? You know, it's funneling money to terrorists, and therefore we're going to shut down WeChat. Would that be... That would be a different case, then? That would fall under IEPA? Because in that case, the government wouldn't actually have the intent of shutting down the speech, but would actually be handling a business transaction. I'm not sure that would fall within IEPA. The government has a whole host of other tools at hand, and there's a lot of overlap between the IEPA and First Amendment arguments. And I think that would certainly be a relevant factor under the First Amendment. Under IEPA, the question is whether they are prohibiting communications or prohibiting the international exchange of information. And if that is, in fact, the direct effect of the regulation, then yes, that wouldn't fall within their IEPA authorities. It might very well fall within a range of other statutory authorities that the government might have. But the... Entirely missing from the government's IEPA arguments in this court and in the D.C. Circuit and the Third Circuit has been the fact that IEPA was intentionally passed to limit the president's authority. The government acts as if it was a blanket grant of authority, but it's not. It was passed in the aftermath of Vietnam and Watergate and the determination that there were endless national emergencies that have been left on the books indefinitely that the president was using unnecessarily. So it was passed with specific limits, and then Congress has repeatedly extended those limits through the Berman Amendment, through the 94 Amendments and such. So if you look at the actual just text of Section 1702B1 and B3, it seems incontrovertible that an action to shut down a medium of communication like this would fall within the exemption from the president's authorities. So on IEPA, since we're here, I'd like to quickly turn to the question of whether the It's within the court's discretion whether to do so, but we did raise the arguments in the District Court. It was two and a half pages of the nine-page renewed motion for preliminary injunction. The government has briefed the issue not only here but in other courts. We looked at the briefs in the other courts. This court certainly can, but I personally think that Mr. Byron has done an admirable job of summarizing those arguments here in this brief. And it's also, let's look at the primary case they rely on for saying that the court can't reach IEPA, which is the Balby-Rogers case. That was a permanent injunction, not a preliminary injunction, after a seven-year trial where the court relied, where after changes in legal authority, the parties were arguing a new theory that relied on factual evidence, not on the record. There aren't any different facts at issue here. This is essentially a legal determination. And finally, in Balby-Rogers, importantly, the court remanded without vacating the injunction. The District Court, a year or so later, modified the permanent injunction in light of the remand. So if the court wants to remand, we certainly won't object, but I do think that Mr. Byron's assertions of inadequate briefing are belied by the actual briefs here, and that the court can and should address this because, as Judge Bybee said, it's a method of constitutional avoidance. The final thing I'll say under IEPA, before I turn to the First Amendment, is that the IEPA analysis does not involve the same sort of balancing as the First Amendment. Congress regularly passed statutes that address issues similar to First Amendment arguments, but go further. This is just a, if this is a form of personal communication, it's flatly banned under IEPA. So the court doesn't need to go to questions of narrow tailoring, nor in the preliminary injunction context, really are the questions of the harms as relevant, given how clear the statutory argument is. But it is clear the district court has not ruled on this. Yes, Your Honor, it's clear. We briefed it to her, and she said, I don't, essentially, I don't have time to reach this. Yeah, well. Well, it is interesting. She didn't say she didn't have time. She said the record and the argument do not allow the court. Why is that? What more, I'm having a hard time understanding what more record you would need. Perhaps, maybe she felt like the arguments were fully exhausted. Is there something more that would be needed in a record to decide? I don't think so, Your Honor. It's important for this specific purpose to understand a little more about the history of how this litigation proceeded. We stood after the executive order was enacted, but before the Secretary's identification came out, and the court, in fact, had full briefing and her argument on a preliminary junction on that before the Secretary's identification. After that was issued, we filed a renewed motion for a summary judgment, an amended complaint, and there was a new argument. And I think the court thought that since all of the focus with respect to the executive order had been more specifically on First Amendment issues, that it might not. Counsel, with respect to IEPA, so in some respects, it appears that Congress has reserved, let's say, reserved to itself authority to act in the B-1, B-3 context of 1702. That is, it hasn't entirely bought your theory of the First Amendment here. It's at least said, the President's not going to do this, at least not without our authority. Now, if Congress were after, let's suppose that we agreed with the District Court in D.C. and the Eastern District of Pennsylvania on the IEPA question, and thought that this was beyond the President's authority, and Congress then held a series of hearings regarding WeChat, concluded that it presented a danger, and passed a law that was effectively the same thing as the Secretary of Commerce has done here under the President's direction, I assume we'd still have a First Amendment question. Are you in a very different position then? Yes, Your Honor, we would be in a very different position because we would then be engaged in the First Amendment analysis of whether it's appropriately targeted, whether the level overview, and then the narrow tailoring. I think after such hearings, we might have a harder argument on the narrow tailoring. But your argument about at least time, place, and manner, and perhaps strict scrutiny if it's content-based, would be the same whether it was directed at Congress or whether it was directed at the Executive Order, is that correct? Yes, Your Honor. Yes, Your Honor. On your point, I will flag that Section 1708 was added to IEPA. It's not applicable here. It's about industrial espionage, but it was added after the Sony scandal, the Sony cyber hacking, precisely like that in a month. So, Counsel, if we were to run down the First Amendment road, and we agreed with you and agreed with the District Court, and Congress then responded with a series of hearings on Certainly not, Your Honor. I mean, for starters, we're here, it's important to remember, we're here on a appeal from a preliminary injunction. So we don't actually have a District Court ruling, nor will this court make a ruling that determines any legal questions, absolutely. Beyond that, I don't think there's any precedent for saying that a ruling, even on the merit saying the government hasn't shown that it can do what it's doing under the First Amendment, given narrow tailoring, given the evidence of harm, binds the government for all time worthy evidence to develop differently. So, I mean, on that, I'd like to let's, if you don't mind, let me address some of these evidentiary questions, because I think they're important. The District Court, and we agree that the national security issues that the government is concerned about here are significant, they're important, they're real. What the District Court found is a factual matter, subject to clearer review, is that the government hadn't shown, hadn't demonstrated that WeChat was, in fact, a significant portion of that risk, that the evidence that WeChat was being used to surveil in the United States was real. I mean, on this, I was particularly struck in reviewing the excerpts of record of appendix F to the government's justification memo, which lists the example, and that's at ER, I think it's two, I'll find the page. But it lists the examples of WeChat surveillance, and if you look at them, every single one of them is in China. This has been the consistent problem with the government's arguments about WeChat is that they make hypothetical arguments about possible surveillance in the United States without any actual evidence of that, which, when you're talking about acts that trench on the First Amendment rights of users of WeChat, of members of the Chinese diaspora who use this to communicate among themselves and with people in China, there needs to be more. Beyond that, the actual acts that the government proposed, the specific bans, these company to company transactions that they purport to preclude, have nothing to do with any surveillance. So their goal is, according to the government, to shut down WeChat in one to two years. And there's a factual question whether they would have shut down WeChat instantly or over the course of a couple of year long period. The district court found that it would have been more or less instant. I think that's a determination that's entitled to deference, but it doesn't really matter. The point is, under the government's theory, WeChat and Tencent can continue to surveil users for several years while they slowly eat away at the functionality of the app. Rather than taking specific actions like those that our experts suggested and that it turned out thereafter Tencent had suggested in its mitigation proposals, that would have actually addressed the surveillance without trenching on my client's speech. So that's a classic First Amendment analysis. Can you explain this to me? The government says, this is not actually impeding First Amendment rights. This is just a time, place, and manner. You can't use this particular channel because it has all of these security problems. But you can communicate with each other in any other way that you want. Now, would you explain to me, what are the unique features of this that mean that this is a suppression of communication and not time, place, and manner? I'm not sure those are the alternatives. I mean, I think that the government is saying that even under time, place, and manner review, it's okay. What are the alternatives? I think the question is, what are the alternatives that exist? Or explain, I guess, in your position, why are they inadequate? Why are they? Yes, of course. And again, this is a factual question on which the district court made a specific holding that the alternatives were inadequate, which is the deference. But beyond that, there are a couple of things. First, the government paints WeChat far too narrowly. WeChat is not just a means of one-to-one communication, like email or a phone call or a signal message. It's a form of social media. It's a form of news sharing. It's a form of business advertising. It's a super app that has large arrays of functionality beyond that sort of one-to-one messaging. Lots of them. There are lots of those. But not that this community uses, and not that people within the United States can use to communicate with China. So Facebook has many of these same functionalities, but Facebook is banned in China. And one of the specific uses, one of the reasons that the Chinese American community, the Chinese diaspora, uses WeChat is to communicate with their friends and relatives in China. That's protected First Amendment speech. And saying, you can use Facebook, it doesn't allow them to do that. It's just far afield from the ways this is actually used in the community. Counsel, doesn't that suggest that the Chinese government has channeled all communication with the United States through WeChat, because it is the only available platform, because it's banned other things? Doesn't that heighten the risk of surveillance that the government has suggested? I don't think so, Your Honor. Because I'm not saying that there aren't other forms of communication that people can hobble together. What my clients, the plaintiffs said in their factual declarations, which the district court gave credence, was that they've tried these other alternatives and they were far from adequate substitutes, which is different from saying that they couldn't talk to a specific person through them. And this goes, again, to the balancing that is necessary under the First Amendment analysis, which is, for example, if the government had in fact had put before the district court a factual evidence of significant surveillance or espionage on WeChat in the United States, then the balancing of whether it would be appropriate for them to block that channel, even for the communications, might be different. That's a classic First Amendment analysis. What they're saying instead is, based on our hypothesis that WeChat might be used for this, but we have no actual evidence of it, we should be allowed to block it entirely now. And that is blocking mediums of communication that members of the Chinese diaspora rely on. I want to hit you on that argument a little bit. What I heard you just say is, well, if the government could actually prove that this was being used for espionage, then maybe they'd have the ability to do that. But here, it's just a supposition. I think we owe a lot of deference to the government on their articulation of the national security interests here. The question is, does the First Amendment trump that? I just want to make sure I understand your argument. Is that your argument, that there's just a factual predicate that's really missing here that prohibits the government from doing this? Not quite, Your Honor. I mean, I of course acknowledge that the government gets significant deference in the national security context. And again, neither my clients nor the district court question that. But every one of the cases that the government uses for this proposition of deference in the national security context talks about how the courts can't abdicate their roles here. They must still look at the question. My point was more that, essentially, the more evidence there is of a harm and of government actions that are targeted directly at addressing that harm, the more, under a First Amendment analysis, they could trench on speech. Here, the problem isn't just the lack of evidence of harm, though. It's the lack of action that would address that harm. And I think that's actually the bigger problem that the government faces. Well, that's how I—okay, thank you. Because that's how I'd understood your argument. I just wanted to make sure, based on what you'd said previously. Yeah, no, that is my argument. I mean, it's—the government has never said that there's anything about a contract with a— And your position, as I understand it, is that these restrictions, even if they were permitted, you know, even if there's statutory authority to do it, they don't actually do what the government thinks they're going to do. They don't actually scale back any of the potential surveillance that the government thinks might be going on. Precisely, Your Honor. There's nothing about content distribution networks or internet peering arrangements that—and blocking those contracts that will stop the government—the purported surveillance on WeChat. Instead, requiring the data to be hosted in the United States, setting up monitoring systems, these are all efforts that would actually allow for blocking of surveillance. And general data privacy laws in the United States might actually do so, too. There aren't—I mean, they are addressing this problem through means that will, over the course, in their own view, over the next two years, let the Chinese government continue to surveil the users, rather than taking actions that would actually address the problem that they identify. So we don't think it's narrowly tailored in any way in that sense. I do want to say, of course, that while I don't think the court needs to reach either prior restraint law or strict scrutiny, we do, under content-based restrictions, we do think both are applicable here. This case reminds me a lot of the city of Ladue, where the court talks about the restrictions on street signs there as prior restraints, yard signs, but then says, essentially, even if we accept this is time, place, and manner review, it doesn't need it. That's a common approach that the courts, including this court, takes when they don't need to reach strict scrutiny in a context. And we think this case—and this is essentially what the district court did as well. I'm mindful that I'm over time, but if— If there's further questions, and maybe there's not. So I guess if not, then feel free to sum up. Yeah, I guess I've said essentially everything I'd like to say, Your Honor. I think under either AIPA or the First Amendment, it's clear that the government is inappropriately trenched on my client's rights, and that the preliminary injunction was appropriate and should be affirmed. Thank you, counsel. Mr. Byron, we'll give you three minutes for rebuttal. Thank you, Judge Nelson. So I want to address first a comment that the plaintiff's counsel made about the intent to prohibit speech. There is no intent to prohibit speech. There is an intent to prevent surveillance and espionage by a foreign adversary, and the particular means used by the executive to address that objective are entitled to deference. I think opposing counsel recognized that. But couldn't they—couldn't the government do that through alternative means? Like, for example, requiring that WeChat set up a separate U.S. subsidiary that was only to—to China, you know, by China specifically. Is that—is that not a possibility? No, Judge Nelson, and the reason it's not is explained in the record where the Secretary of Commerce explained that the mitigation proposal—and I won't get into specifics because some of it's under seal—does not adequately address the national security concerns. The government is entitled to deference in its assessment of how and whether a particular measure will be effective. So—so I do want to emphasize that first. So the Walsh against Brady, just to address this—this statutory question very briefly, does not support plaintiffs' argument about what indirectly regulate means, and I want to emphasize that. And again, this is a—this is a complex question that we think is—should not be reached in the first instance. Counsel, I want to ask—I want to ask you about that. Let me ask—let me ask the easy question first, which is, has the—has the—have the TikTok case has been argued? Uh, the first appeal in the D.C. Circuit was argued about a month ago, Judge Feige. The second appeal is—is—has ongoing briefing, does not yet have a—an argument date. In the Third Circuit case, Marland, there is an argument set for February 11th, I believe it is. Okay. I'm sorry, and you said that something else would—you're still awaiting briefing? In the second—the second appeal, that is, the appeal from the second injunction— The second one in D.C. Okay. Now, Counsel, what is it—I—I—I just looked at your supplemental brief, saw again where you said twice on page one, again on page four of the supplemental brief that the—that the—that the plaintiffs suggested this be remanded if we were inclined to do that. Of course, the plaintiffs may have been anticipating that we should have to remand that if we were to rule against them on the First Amendment. So the government's in a slightly different position, because I'm suggesting that there affirming the injunction that may avoid some unpleasantness that the government really might not want to have if we were inclined to affirm the preliminary injunction on First Amendment grounds. So that is, if you were given your choice between losing on one ground or losing on another ground, you might well prefer to lose on AIPA than to lose on the First Amendment, because there might be a greater constraint on what Congress could do in the future. So—so let me—but the question that I have is, what really is there that you could brief that is different from what you have already submitted to us? Well, Judge Biby, I'll—I'll—I'll say two things about that. First of all, we were constrained significantly by the limits imposed by this court on supplemental briefing. By comparison to the 12-page brief we submitted here, I believe we submitted approximately 80 pages of—of briefing, and—and plaintiffs submitted a full responsive brief in the D.C. Circuit as well, and likewise, you know, in the other appeals that are proceeding. So, first of all, just as a matter of detail, there is—there is a sufficient amount of detail that—that we were not able to get into here. Secondly, you've raised concerns about two issues in—in the argument today, two of the exceptions in 1702B, subsection 1 and subsection 3. Plaintiffs, I think, in their complaint addressed others. We did not have an ample opportunity to get into those, either in the briefing or in the argument, and so I'll just—I'll just, you know, remind the court that—that it should be cautious about addressing an issue that has not been fully briefed, and I'll leave it at that. If I may just proceed, I—I see I'm over my time, but I wanted to make a couple of brief points, if I—if I may, to respond to Plaintiffs' argument. First, they concede that the national security concerns here are significant and real. We already emphasized the need for deference, which they also acknowledged. The restrictions here are narrowly tailored because they're designed to prevent the continued expansion of the collection of sensitive personal data on U.S. users that would be available to Chinese surveillance and intelligence agencies. The—the goal—the balancing of the interests of current users, including these plaintiffs, compared to new users, is particularly stark. And by the way, the Supreme Court in Williams-Uley emphasized the need to accommodate, even under a strict scrutiny analysis there, that kind of balancing by permitting some speech while prohibiting other speech. And in—with respect to the first prohibition here, which prevents new users from downloading the app from a mobile—from an app store, the—the injunction against that first prohibition doesn't address these plaintiffs' asserted harms at all. And it, in particular, should be vacated, even if none of the others is. And finally, it's not enough—the plaintiffs talked about Ladue. It's not enough that a particular medium or channel is unique or, as the court there said, important or distinct. It has to also be, as the court said in Ladue, venerable. Residential signs, the court said, were a long-standing means of communicating ideas associated with a particular person or location. And—and that's significant and not present here as well. And finally, I'll just emphasize that the plaintiff's demand for specific evidence of a particular kind of harm is particularly dangerous, as the Supreme Court recognized in Humanitarian Law Project, 561 U.S., at pages 34 to 35. Thank you, Your Honor. We'd urge the court to vacate the injunction below. Thank you. Thank you both, counsel, for an excellent argument on a—on a complex case. That's the final case for argument. It's now submitted, and the court will be in recess. Thank you. Thank you, Your Honors.
judges: Schroeder, Bybee, Nelson